IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DORSA SMITH                             )
                                        )
              Plaintiff,                )
v.                                      )        Case No. 3:17-cv-732-DPJ-FKB
                                        )        (Jury Trial Demanded)
MISSISSIPPI PRISON INDUSTRIES           )
CORPORATION, ED STEPHENS,               )
AND JOHN AND JANE DOES 1-6              )
                                        )
              Defendants.               )

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7, Defendants submit this Memorandum in Support of Motion for Summary Judgment.

## INTRODUCTION

Plaintiff, a former employee of Mississippi Prison Industries Corporation ("MPIC"), alleges discrimination based on her race, hostile work environment based on race and an alleged disability, constructive discharge based on race and disability, failure to accommodate for an alleged disability, and that tortious interference with employment by Ed Stephens.[1]  Plaintiff's claims fail for multiple reasons.

In November 2014, MPIC hired Plaintiff as a manager overseeing the work performed by female inmates at MPIC's inmate work program at Central Mississippi Correctional Facility.  As the manager, Plaintiff was responsible for the oversight of female inmates during the production

---

[1] Plaintiff initially also brought retaliation claims, but the retaliation claims have been dismissed. (ECF No. 6.) Plaintiff also alleges John and Jane Does 1-6 as defendants in the lawsuit.  To the extent Plaintiff alleges any other claims against any other defendants, the claims should be dismissed because Plaintiff cannot establish the required elements of the claims against any defendants.

process. This is a full-time position, requiring a manager who could supervise the inmates for a full-time eight hour shift.

Plaintiff requested to work a part-time schedule, and in an e-mail, specifically stated her need to change hours was due to childcare needs. As a result, Human Resources Representative Linda Watson and Production Manager Mr. Stephens understood the request was for childcare. Due to the nature of Plaintiff's position as a manager overseeing female inmates and MPIC's need to operate the facility for eight hours per day, it was determined Plaintiff could not meet the essential functions of her job if she was unable to work a full eight hour shift.

When Plaintiff was notified the position was for eight hours, Plaintiff chose to resign her employment on March 3, 2016. These events come nowhere near the required threshold for a constructive discharge claim. In fact, Plaintiff testified that if she had been offered part-time employment, she would have remained employed. Moreover, Plaintiff's testimony concerning her anxiety and depression demonstrate her medical conditions do not amount to a disability under the Americans with Disabilities Act; similarly, Mr. Stephens, Ms. Watson, nor anyone at MPIC were aware of any medical condition comprising such a disability.

Aside from her resignation and the extremely weak case for constructive discharge, Plaintiff makes several ineffective allegations pertaining to treatment during her employment. The evidence, however, reflects she was not treated any differently than any other employees. One of Plaintiff's chief complaints is Mr. Stephens's use of profanity in front of her. However, the undisputed evidence reveals such language was also used in the presence of other employees, irrespective of race or any alleged disability.

The other nominal issues Plaintiff alleged in the workplace simply do not amount to adverse employment actions for purposes of a cognizable discrimination claim. Plaintiff was never

demoted, suspended, or terminated, and the minor modifications about which she complains were consistent practices for all employees and had valid business reasons.

Plaintiff has absolutely no evidence suggesting she was discriminated on account of her race, subjected to race or disability harassment, or that MPIC failed to provide her a reasonable accommodation. Plaintiff admits she never heard a single race-based or medical condition-based comment by Mr. Stephens, Ms. Watson, or any MPIC supervisor or manager. With respect to the tortious interference claim, Plaintiff cannot establish any of the elements, and Mr. Stephens was in a position of trust; thus, his actions on behalf of MPIC were privileged.

Plaintiff cannot set forth the elements of claims of race discrimination, race harassment, disability harassment, failure to accommodate, constructive discharge, or tortious interference. All of the claims should be dismissed, and Defendants are entitled to summary judgment.

## STATEMENT OF FACTS

### I.     MPIC Background

1.      MPIC is a nonprofit corporation that was created by the Mississippi Legislature in 1990 to provide inmates on-the-job training and realistic work experiences that positively position released inmate workers for gainful employment upon release. (Watson Decl., ¶ 4.)[2]

2.      For that purpose, MPIC provides volunteer work programs for male and female offenders residing within Mississippi's correctional facilities. (Watson Decl., ¶ 5.)

3.      MPIC's work programs are designed to offer inmate workers opportunities to obtain valuable skills and realistic work programs by providing training, work experience and employment skills, fostering self-esteem through personal accomplishment, promoting understanding and respect for community values, and developing social skills to help reduce

---

[2] The Declaration of Linda Watson ("Watson Decl.") is attached hereto as Exhibit 1.

interpersonal conflicts on and off the job.  (Watson Decl., ¶ 6.)

4.      The inmate workers are supervised by MPIC employees and through the inmate's development of communication skills, the inmates learn how to respond to supervision and how to interact within a work environment.  (Watson Decl., ¶ 7.)

5.      MPIC offers products through the programs, including furniture, metal fabrication, printing, embroidery, apparel, mattresses, and recycling services.  (Watson Decl., ¶ 8.)

6.      MPIC operates work programs at the Mississippi State Penitentiary in Parchman, the South Mississippi Correctional Institution in Leakseville, and the Central Mississippi Correctional Facility in Rankin County, where Plaintiff was employed.  (Watson Decl., ¶ 9; Plf.'s Dep., p. 18-19.)[3]

7.      MPIC's corporate office is located in downtown Jackson, where its executives and various departments, including accounting, marketing, and customer service, are located. (Watson Decl., ¶ 10.)

8.      MPIC is an Equal Employment Opportunity Employer, and its Equal Employment Opportunity policy specifically provides:

> In order to provide equal employment and advancement opportunities to all individuals, employment decisions at MPIC are based on merit, qualifications, and abilities. Employment practices will not be influenced or affected by an applicant's or employee's race, color, religion, sex, national origin, age, veteran's status, disability or any other characteristic protected by law. MPIC will make reasonable accommodations for qualified individuals with known disabilities unless doing so would result in an undue hardship. This policy governs all aspects of employment, including selection, job assignment, compensation, discipline, termination, and access to benefits and training.
>
> Any employee with questions or concerns about any type of discrimination in the workplace is encouraged to bring these issues to the attention of their immediate supervisor or Human Resources. If an employee believes he cannot report to his

---

[3] Relevant portions of Plaintiff's Deposition ("Plf.'s Dep."), and all relevant deposition exhibits, are attached hereto as Exhibit 2.

supervisor, he should go directly to Human Resources and/or the CEO. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

(Plf.'s Dep., p. 31, Ex 4, p8.)

9.      During her employment, Plaintiff was aware of MPIC's Equal Employment Opportunity policy.  (Plf.'s Dep., p. 31-32.)

10.      Additionally, MPIC has an exhaustive sexual harassment and inappropriate conduct policy stating, in part, the following:

MPIC is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes or comments based on an individual's gender, race, ethnicity, age, disability or any other legally protected characteristic will not be tolerated. This prohibition includes any conduct which, whether intentional or unintentional, harasses, intimidates, ridicules or insults an employee because of the employee's protected status. As an example, sexual harassment (both overt and subtle) is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited. Sexual or other harassment is unwelcomed by the recipient. Ask whether you would want your wife/husband/mother/pastor to see or hear it. If not, don't do or say it!

(Watson Decl., ¶ 11.)

11.      While she was employed by MPIC, Plaintiff knew how to make complaints of harassment and discrimination.  (Plf.'s Dep., p. 33.)

12.      Specifically, Plaintiff understood she could contact human resources to report any harassment or discrimination.  (Plf.'s Dep., p. 33.)

13.      Plaintiff was also aware that if human resources was unavailable, Plaintiff could directly contact the CEO of MPIC if she believed she was experiencing harassment or discrimination.  (Plf.'s Dep., p. 34.)

## II.    Plaintiff's Employment

14.    On November 3, 2014, MPIC hired Plaintiff as a Warehouse Manager[4] at the Central Mississippi Correctional Facility ("CMCF").  (Plf.'s Dep., p. 18-19, Ex. 6.)

15.    During Plaintiff's employment, MPIC operated one shop with female inmates and a separate shop, the Print Shop, where male inmates worked at CMCF.  (Stephens Decl., ¶ 4.)[5]

16.    When Plaintiff was hired, Plaintiff supervised Kathy Kelley, who was the Warehouse Supervisor.  (Plf.'s Dep., p. 26.)

17.    Ms. Kelly retired on January 23, 2015, and at the time, Jeanette Butler became the Warehouse Supervisor.  (Plf.'s Dep., p. 26-27; Watson Decl., ¶ 12.)

18.    After Ms. Butler was terminated on July 10, 2015, MPIC did not replace Ms. Butler, and Plaintiff was the only MPIC employee working in the CMCF female inmate Warehouse.  (Plf.'s Dep., p. 27; Watson Decl., ¶ 13.)

19.    The only other non-inmate working in the Warehouse was Keisha Crosby, who was a security guard.  (Plf.'s Dep., p. 35.)

20.    Ms. Crosby was not an employee of MPIC, but worked for North Atlantic Security ("NAS"), a security guard agency.  (Plf.'s Dep., pp. 35, 41, 162.)

21.    In Plaintiff's shop, Plaintiff supervised the female inmates who were embroidering apparel, making furniture and producing signs.  (Stephens Dep., p. 13.)

22.    Prior to being hired, Plaintiff interviewed with then-Production Manager Billy Reed.  (Plf.'s Dep., p. 21.)

---

[4] There is differing testimony regarding Plaintiff's official title.  Ed Stephens testified she was the manager for the Embroidery Shop.  (Stephens Dep. 10) (relevant portions attached as Exhibit 3.)   Plaintiff testified she was the Warehouse Manager. (Plf.'s Dep., p. 18.) As a result, MPIC is referring to Plaintiff's position as Warehouse Manager throughout its Memorandum.

[5] The Declaration of Edward Stephens ("Stephens Decl.") is attached hereto as Exhibit 4.

6

23.     During her interview, Plaintiff advised Mr. Reed that she needed to work a shift from 7:00 a.m. until 3:30 p.m. due to Plaintiff's childcare demands.  (Plf.'s Dep., p. 22.)

24.     Mr. Reed granted Plaintiff's request, and Plaintiff's schedule was set as 7:00 a.m. – 3:30 p.m.  (Plf.'s Dep., p. 50.)

25.     On August 3, 2015, Brad Curtis was hired in the position of Chief Executive Officer ("CEO") over all of MPIC's operations.  (Watson Decl., ¶ 14.)

26.     Upon assuming the CEO position, Mr. Curtis began making organization structural changes, including terminating the employment of several individuals.  (Watson Decl., ¶ 15.)

27.     One of the employees Mr. Curtis decided to terminate was Plaintiff's initial supervisor, Production Manager Mr. Reed.  (Watson Decl., ¶ 16.)

28.     Prior to Mr. Reed's termination, Ed Stephens had been the Print Shop Manager at CMCF, where the male inmates worked for MPIC.  (Stephens Decl., ¶ 5.)

29.     Mr. Reed's employment was terminated on August 7, 2015, and at the time, Mr. Curtis promoted Mr. Stephens into the position of Production Manager.  (Stephens Decl., ¶ 6.)

30.     As Production Manager, Mr. Stephens began supervising the work programs at CMCF, including Plaintiff's warehouse, as well as setting up MPIC's potential operations at a Jefferson/Franklin Regional Corrections Facility.[6]  (Plf.'s Dep., p. 35; Stephens Decl., ¶7.)

31.     Upon his promotion to Production Manager, Mr. Stephens made certain policy changes to MPIC's operations at CMCF.  (Stephens Decl., ¶ 9.)

32.     One policy change Mr. Stephens instituted was to cease the practice of collecting and handling money at the prison.  (Stephens Dep., pp. 134-35, 137.)

33.     The Mississippi Department of Corrections classifies money as "contraband," and,

---

[6] Although MPIC dedicated significant time into opening up operations at Jefferson/Franklin Regional Corrections Facility, MPIC was unable to ultimately institute a work program at the facility.  (Stephens Decl., ¶8.)

as a result, it is prohibited at the facilities.  (Stephens Dep., pp. 134-35, 137.)

34.     Thus, Mr. Stephens advised the MPIC employees supervising inmates, including Plaintiff and Print Shop Manager Jimmy Tisdale, to inform potential customers that all purchase orders were required to go through MPIC's downtown office, where MPIC's marketing and customer service departments were located.  (Plf.'s Dep., pp. 62-63; Stephens Dep., pp. 135-36.)

35.     In connection with this new practice, Mr. Tisdale created signs to put up at CMCF stating that all orders must go through MPIC's downtown office.  (Stephens Dep., p. 136.)

36.     Plaintiff, however, believed Mr. Stephens removed this responsibility from her to "push [her] further into being depressed and stressed out with [her] job."  (Plf.'s Dep., p. 64.)

37.     Because Plaintiff was the only MPIC employee at the female inmate shop, Mr. Stephens made the decision that Plaintiff's physical presence was required at the shop, where she could supervise the inmates and ensure the quality of the products.  (Stephens Dep., pp. 24-25.)

38.     Accordingly, Mr. Stephens advised Plaintiff that if her shop required supplies, Plaintiff could provide a list to either Mr. Stephens or Mr. Tisdale, and one of them would get it, so Plaintiff would not have to leave CMCF. (Stephens Decl., ¶ 10.)

39.     Mr. Tisdale was the Print Shop Manager, and at the time, MPIC also employed a Print Shop Supervisor, Will Brooks, who was able to supervise the male inmates if Mr. Tisdale left the facility to make purchases.  (Stephens Decl., ¶ 11.)

40.     Although Plaintiff takes issue with not being allowed to make purchases of supplies, the decision was made simply to ensure MPIC had appropriate coverage for the female inmates at CMCF.  (Compl., ¶ 16; Plf.'s Dep., p. 67.)

III.    **Plaintiff's Resignation**

41.     Throughout Plaintiff's employment, she requested and received leave for

numerous personal and medical issues; in 2015, Plaintiff was absent the following days: 2/11/15, 2/24/15, 2/25/15, 2/17/15, 3/16/15, 4/15/15, 5/4/15, 5/5/15, 5/20/15, 6/1/15-6/4/15, 6/16/15, 6/24/15, 7/21/15, 7/22/15, 8/14/15, 8/18/15, 8/24/15, 8/25/15, 9/9/15, 9/10/15, 9/11/15, 9/14/15, 9/15/15, 9/21/15, 10/2/15, 10/13/15, 10/16/15.  (Watson Decl., ¶ 17.)

42.     In 2016, Plaintiff was absent for either personal or sick leave on 1/4/16, from 1/8/16 – 2/15/16 and 2/22/16 – 2/29/16.  (Plf.'s Dep., p.  214-15; Watson Decl., ¶ 18.)

43.     When Plaintiff was not present at the Warehouse, MPIC's operations continued, and MPIC had a need for a non-inmate individual to print out purchase orders the inmates were to complete that day.  (Stephens Dep., p. 130.)

44.     Thus, while Plaintiff was out, MPIC requested that NAS security guard Ms. Crosby log in to MPIC's system to print out orders for the inmates.  (Stephens Dep., pp. 130, 132.)

45.     Additionally, during Plaintiff's employment, Mr. Stephens had become aware that Plaintiff was frequently arriving late for her shift or leaving early.  (Stephens Dep., pp. 104-05.)

46.     Mr. Stephens believed the Warehouse hours were 6:30-3:00, and to "get everyone on the same page," on March 1, 2016, Mr. Stephens e-mailed Plaintiff, stating, "You must get here on time 6:30 and stay until 3:00. Those are the hours set.  Mandatory. You are not working the hours you are required to. This is the second warning."  (Plf.'s Dep., p.p. 194-95, Ex. 12; Stephens Dep., pp. 102, 104.)

47.     On March 2, 2016, Plaintiff responded to Mr. Stephens, stating the following:

I tried contacting you on yesterday but spoke with Linda after not reaching you. I inquired about your e-mail stating we could adjust my hours to part-time 8 a.m. to 2:15 p.m.  Linda stated that she would get with Bill on whether 30 hours would change my status to part-time. It's impossible for me to be here for 6:30, and if the adjustments can't be made, then I would have to resign effective immediately. I can't provide adequate child care for my ten-year-old at this time with those hours.

9

I could actually come in for 7:30, same as print shop, but not 6:30. Let me know if these accommodations can be met as soon as possible. Thanks, Dorsa.

(Plf.'s Dep., p. 196, Ex. 12.)

48.     Notably, the only reason Plaintiff stated she was unable to work certain hours was strictly due to childcare.  (Plf.'s Dep., p. 196, Ex. 12.)

49.     MPIC's and Mr. Stephens's objective was for the Warehouse to be operational for eight hours per day, and, therefore, MPIC needed its Warehouse Manager to work an eight-hour shift (with a thirty-minute lunch break).  (Stephens Dep. 105; Watson Dep., pp. 100-101.)[7]

50.     As a result, Mr. Stephens replied via e-mail, "If you come in at 730 and stay till 4 like print shop manager then that will work."  (Plf.'s Dep., p. 197, Ex. 12.)

51.     Plaintiff responded, "What happened to the 8am to 2:15 pm, that you mentioned in the email?  I'm ok with the change in pay and the status change.  Those are the only hours I can work otherwise I would have to resign."  (Plf.'s Dep., p. 197, Ex. 12.)

52.     Plaintiff was requesting a six-hour work day, which would have reduced MPIC's production hours at CMCF; therefore, Mr. Stephens called Ms. Watson to determine what options were available.  (Stephens Dep., pp. 108-09.)

53.     Mr. Stephens and Ms. Watson were discussing over the phone whether Plaintiff could transition into a part-time role, when CEO Mr. Curtis overheard the conversation.  (Watson Dep., pp. 56-57.)

54.     Mr. Curtis asked what Ms. Watson was discussing, and Ms. Watson informed Mr. Curtis that Plaintiff had requested to move to a part-time position.  (Watson Dep., pp. 56-57.)

55.     Mr. Curtis  responded  that  CMCF  needed  to  run  an  eight-hour  schedule  and

---

[7] Relevant portions of Linda Watson's Deposition ("Watson Dep.") are attached hereto as Exhibit 5.

sometimes even overtime, and therefore, MPIC did not have a need for a part-time position at CMCF.  (Watson Dep., pp. 56-57.)

57.     On March 3, 2016, Ms. Watson and Mr. Stephens met with Plaintiff at CMCF. (Watson Decl., ¶ 19.)

57.     During the meeting, Ms. Watson informed Plaintiff that MPIC was unable to provide her with a part-time schedule.  (Plf.'s Dep., pp. 98, 126.)

58.     When Ms. Watson advised her that a part-time position was not available, Plaintiff asked if she could resign, to which Ms. Watson agreed.  (Plf.'s Dep., pp. 126-27.)

59.     Plaintiff admits that if MPIC would have offered her part-time employment on March 3, 2016, Plaintiff would have accepted.  (Plf.'s Dep., p. 157.)

60.     Because Ms. Crosby was familiar with the responsibilities of the Warehouse Manager position as she had covered when Plaintiff was absent, Ms. Crosby was hired by MPIC into the position after Plaintiff resigned.  (Stephens Dep., pp. 130, 132.)

61.     Ms. Crosby's employment was terminated on August 28, 2016, when MPIC shut down its operations for female inmates at CMCF.  (Stephens Decl., ¶ 13.)

## IV.     Plaintiff's Complaints

### A.     Alleged Profanity

62.     Plaintiff alleges Stephens used vulgar language when communicating with her. (Plf.'s Dep., p.  46.)

63.     On one occasion, in September 2015, Mr. Stephens stated to Plaintiff something to the effect of, "Please make sure that this shit is right.  I don't want anyone else to get fucking fired."  (Plf.'s Dep., p.  46; Stephens Dep., pp. 18, 42, 80.)

64.     Because numerous employees had been recently terminated by CEO Mr. Curtis,

11

including Plaintiff's prior supervisor, Mr. Stephens was attempting to encourage Plaintiff to ensure production was on-time so Plaintiff would keep her job.  (Stephens Dep., pp. 18, 42-43.)

65.    Mr. Stephens was not attempting to be hostile, aggressive, and certainly not discriminatory toward Plaintiff.  (Stephens Dep., p. 46.)

66.    Following this conversation, Plaintiff contacted Linda Watson, informing Ms. Watson that Mr. Stephens had used vulgar language.  (Watson Dep., pp. 23-24.)

67.    In response, Ms. Watson apologized to Plaintiff, informed Plaintiff it was unacceptable behavior, and advised Plaintiff that she would speak with Mr. Stephens.  (Watson Dep., pp. 24-25.)

68.    Subsequently, Ms. Watson called Mr. Stephens and issued to him a verbal reprimand, advising Mr. Stephens that such language was inappropriate.  (Stephens Dep., pp. 17, 19, 34.)

69.    Mr. Stephens subsequently apologized to Plaintiff for using vulgar language in front of her.  (Stephens Dep., pp. 18, 60, 62, 125.)

70.    As Plaintiff admits, Mr. Stephens informed Plaintiff, "If I offended you, then I'm sorry.  I apologize."  (Plf.'s Dep., p. 96.)

71.    Plaintiff, however, was not the only employee who experienced Mr. Stephens' profanity.  (Stephens Dep., pp. 21, 66-67, 89, 123.)

72.    Mr. Stephens also used profanity in front of his boss, Garrett Stapleton (Caucasian).  (Stephens Dep., p. 21; Stephens Decl., ¶ 14.)

73.    Ms. Watson also talked to Mr. Stephens about his inappropriate language with Mr. Stapleton.  (Stephens Dep., pp. 66-67.)

74.    Additionally, Mr. Stephens was counseled by Ms. Watson after Mr. Stephens used

the work "fuck" in front of an accounting clerk, Michelle Abercrombie (Caucasian), who reported she was offended by the comment.  (Stephens Dep., p. 89; Stephens Decl., ¶14.)

75.     Mr. Stephens admits he also used profanity in front of Ms. Crosby and Ms. Walker. (Stephens Dep., p. 123.)

76.     Mr. Tisdale (Caucasian) has also heard Mr. Stephens use profanity, including the word "fuck", on occasion.  (Tisdale Decl., ¶ 4; Plf.'s Dep., p 54.)[8]

**B.     Donna Walker's Hours**

77.     Plaintiff alleges other employees were allowed to come in at different times, while Plaintiff was not.  (Compl., ¶ 17.)

78.     Specifically, Plaintiff alleges while Donna Walker was an MPIC employee, she was allowed to change her hours to work from 6:00 to 2:30.  (Plf.'s Dep., p. 74-75; 78.)

79.     MPIC was willing to adjust Plaintiff's hours, as long as it was an eight hour shift; Plaintiff, however, was requesting part-time.  (Stephens Dep., p. 105; Watson Dep., pp. 100-01.)

80.     Plaintiff does not know a single MPIC employee who worked part-time while Mr. Stephens was the Production Manager and admits Ms. Walker never worked under Mr. Stephens' supervision.  (Plf.'s Dep., p. 78-79, 90-91, 137.)

**C.     Plaintiff's Race Discrimination Allegations**

81.     Plaintiff alleges Mr. Stephens isolated her by going to the security officer or the white female offenders to ask them questions about work, which Plaintiff believed Stephens should have been asking Plaintiff.  (Plf.'s Dep., p. 70, 80.)

82.     Plaintiff contends Mr. Stephens took an inventory sheet Plaintiff had prepared and asked a white inmate to conduct another inventory count.  (Plf.'s Dep., p. 101.)

---

[8] The Declaration of James Tisdale ("Tisdale Decl.") is attached hereto as Exhibit 6.

83.     During her employment, Plaintiff never heard anyone, including Mr. Stephens, make a racial slur or racial comment toward Plaintiff.  (Plf.'s Dep., p. 238.)

**D.     Plaintiff's Allegations Regarding Her Medical Condition**

84.     Plaintiff alleges she suffered anxiety and depression.  (Compl, ¶ 20.)

85.     Because of anxiety and depression, Plaintiff alleges she was limited in her ability to work and spend time with her family.  (Plf.'s Dep., p. 85.)

86.     Plaintiff contends due to the severity of anxiety and depression, the only thing she wanted to do when she got home from work was lay down and cry.  (Plf.'s Dep., p. 85-86.)

87.     Plaintiff testified that at work, she was unable to focus on her job functions.  (Plf.'s Dep., p. 86.)

88.     Plaintiff alleges that on September 17, 2015, she discussed with Ms. Watson potentially resigning due to stress she was experiencing at work.  (Plf.'s Dep., p. 116-117.)

89.     Plaintiff testified that during one conversation, Mr. Stephens advised her, "I'm sorry that you're dealing with the anxiety.  I hope it gets better."  (Plf.'s Dep., p. 114.)

90.     Plaintiff alleges shortly after her resignation, she was advised by her therapist and psychiatrist that she was unable to work.  (Plf.'s Dep., p. 114.)

91.     At the time of her deposition, Plaintiff testified she did not know if she was currently able to return to work.  (Plf.'s Dep., p. 187-88.)

92.     Plaintiff believes she was treated differently because of her anxiety.  (Plf.'s Dep., p. 238.)

93.     However, the only other comment Plaintiff ever heard regarding any medical condition is one from Ms. Crosby – who was not an MPIC employee at the time – pertaining to Plaintiff's anxiety.  (Plf.'s Dep., p. 239.)

94.    At the time the decision was made not to reduce Plaintiff's hours to part-time, Ms. Watson and Mr. Stephens understood the request was due to childcare – not anything related to a medical condition.  (Watson Dep., p. 97-99; Stephens Dep., pp. 68, 107-08, 140.)

95.    Additionally, Plaintiff admits she never had any conversation with the decision-maker Mr. Curtis and never informed him of any medical condition.  (Plf.'s Dep., p. 98.)

## LEGAL STANDARD

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co.*

*v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).

## LAW AND ARGUMENT

### I.   RACE DISCRIMINATION

Plaintiff alleges MPIC discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). (Compl., pp. 10-13.) Courts within the Fifth Circuit rely on the same analysis for race discrimination claims under Title VII and Section 1981. *Pratt v. City of Houston, Tex.*, 247 F. 3d 601, 606 (5th Cir. 2001). When a plaintiff has no direct evidence of unlawful discrimination, as here, the Court must analyze a race discrimination claim under the *McDonnell Douglas* framework. *Ashley v. Metro Ford Auto. Sales, Inc.*, 2012 U.S. Dist. LEXIS 7281, *7 (N.D. Miss. Jan. 23, 2012). To establish a *prima facie* case of race discrimination, Plaintiff must show she (1) suffered an adverse employment action, (2) was qualified for the position at issue, (3) belongs to a protected class, and (4) either received less favorable treatment than similarly situated employees outside the protected class or was replaced by someone outside a protected class. *Jackson v. Lowndes Cty. Sch. Dist.*, 126 F. Supp. 3d 772, 777 (N.D. Miss. 2015).

If Plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant sets forth a legitimate, nondiscriminatory reason, the presumption of discrimination disappears, and the burden shift back to the plaintiff to "offer sufficient evidence to create a genuine issue of material fact either (1) that [the employer's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [the employer's] reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is [the employer's] protected characteristic (mixed-motives alternative)." *Rachid v. Jack*

*in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004).  The ultimate burden remains at all times with the plaintiff.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000).

In her Complaint, Plaintiff separates her race discrimination claim into two categories: (1) during her employment and (2) relating to her constructive discharge.  (ECF No. 2, pp. 10-14.)  As a result, MPIC will address the claim in the same manner.

### A.   Plaintiff's Race Discrimination Allegations During Her Employment.

Plaintiff cannot show that during her employment she suffered an adverse employment action or was received less favorable treatment while she was employed by MPIC.  The Fifth Circuit Court of Appeals holds that an employment action that does not affect an employee's job duties, compensation, or benefits is not an adverse employment action. *Pegram v. Honeywell, Inc.*, 361 F. 3d 272, 282 (5th Cir. 2004). Instead, a plaintiff must produce evidence of an ultimate employment decision – an action such as "hiring, granting leave, discharging, promoting, [or] compensating." *Smith v. Harvey*, 265 F. App'x 197, 202 (5th Cir. 2008).

In support of her race discrimination claim during her employment, Plaintiff alleges: she was subjected to the regular use of profanity (Compl., ¶ 13); she was not allowed to collect and handle money (Compl., ¶ 15); she was not allowed to make purchases (Compl., ¶ 16); she was not allowed to come in at different times (Compl., ¶ 17); and she was isolated and did not receive proper communication (Compl, ¶ 18).  None of these alleged actions amount to an "adverse employment action" for purposes of a discrimination claim because Plaintiff's compensation, benefits and overall responsibilities were not impacted by any of these alleged actions. Additionally, Plaintiff was not treated any differently than employees outside her protected class.

The undisputed facts plainly reveal she was not the only employee who was subjected to profanity.  On one occasion, in September 2015, Mr. Stephens stated to Plaintiff something to the

effect of, "Please make sure that this shit is right. I don't want anyone else to get fucking fired."
(SOF at ¶ 63.) Because numerous employees had been recently terminated by CEO Mr. Curtis, including Plaintiff's previous supervisor, Mr. Stephens was attempting to encourage Plaintiff to ensure her production was on-time so Plaintiff would keep her job. (SOF at ¶ 64.) Mr. Stephens was not attempting to be hostile, aggressive, and certainly not discriminatory toward Plaintiff. (SOF at ¶ 65.) Following this conversation, Plaintiff contacted Linda Watson, informing Ms. Watson that Mr. Stephens had used vulgar language. (SOF at ¶ 66.) In response, Ms. Watson apologized to Plaintiff, informed Plaintiff it was unacceptable behavior, and advised Plaintiff that she would speak with Mr. Stephens. (SOF at ¶ 67.) Subsequently, Ms. Watson called Mr. Stephens and issued to him a verbal reprimand, advising Mr. Stephens that such language was inappropriate. (SOF at ¶ 68.) Mr. Stephens subsequently apologized to Plaintiff for using vulgar language in front of her. (SOF at ¶ 69.) As Plaintiff admits, Mr. Stephens informed Plaintiff, "If I offended you, then I'm sorry. I apologize." (SOF at ¶ 70.)

Plaintiff, however, was not the only employee who experienced Mr. Stephens' profanity. (SOF at ¶ 71.) Mr. Stephens also used profanity in front of his boss, Garrett Stapleton (Caucasian). (SOF at 72.) Ms. Watson also talked to Mr. Stephens about his inappropriate language with Mr. Stapleton. (SOF at ¶ 73.) Additionally, Mr. Stephens was counseled by Ms. Watson after Mr. Stephens used the work "fuck" in front of accounting clerk Michelle Abercrombie (Caucasian), who reported being offended. (SOF at ¶ 74.) Mr. Stephens admits he also used profanity in front of Ms. Crosby and Ms. Walker. (SOF at ¶ 75.) Mr. Tisdale has also heard Mr. Stephens occasionally use profanity, including the word "fuck". (SOF at ¶ 76.)

With respect to handling money, the Mississippi Department of Corrections classifies money as "contraband," and, as a result, it is prohibited at the facilities. (SOF at ¶ 33.)

Accordingly, Mr. Stephens decided to cease the entire practice of collecting and handling money at CMCF. (SOF at ¶ 32.) Mr. Stephens advised the MPIC employees supervising inmates, including Plaintiff and Print Shop Manager Jimmy Tisdale, to inform potential customers that all purchase orders were required to go through MPIC's downtown office, where MPIC's marketing and customer service departments were located. (SOF at ¶ 34.) In connection with this new practice, Mr. Tisdale created signs to put up at CMCF stating that all orders must go through MPIC's downtown office. (SOF at ¶ 35.) As a result, it is clear this alleged action was not taken toward Plaintiff because of her race and was a policy implemented for all MPIC shops at CMCF.

Regarding her complaint that she was not able to make purchases, Plaintiff was the only MPIC employee at the female shop, and Mr. Stephens simply wanted Plaintiff to be physically present at the shop, where she could supervise the inmates and ensure the quality of the products. (SOF at ¶ 37.) Accordingly, Mr. Stephens advised Plaintiff that if her shop required supplies, Plaintiff could provide a list, and either Mr. Stephens or Mr. Tisdale would get it, so Plaintiff did not have to leave CMCF. (SOF at ¶ 38.) Mr. Tisdale was the Print Shop Manager, and MPIC also employed a Print Shop Supervisor, Will Brooks, who was able to supervise the male inmates if Mr. Tisdale left the facility. (SOF at ¶ 39.) Although Plaintiff takes issue with her not being allowed to make purchases of supplies, this decision was made simply to ensure MPIC had appropriate coverage for the female inmates at CMCF. (SOF at ¶ 40.)

Plaintiff alleges other employees were allowed to come in at different times, while Plaintiff was not. (SOF at ¶ 77.) Specifically, Plaintiff alleges while Donna Walker was an MPIC employee, she was allowed to change her hours. (SOF at ¶ 78.) MPIC was willing for Plaintiff to adjust her hours, as long as she retained an eight hour shift; Plaintiff, however, was requesting a part-time position. (SOF at ¶ 79.) In fact, Mr. Stephens e-mailed Plaintiff stating

that if she wanted to work the same hours as Print Shop, those hours would be acceptable.  (SOF at ¶ 50.)  Plaintiff does not know a single MPIC employee who worked part-time while Mr. Stephens was the Production Manager and admits Ms. Walker never worked under Mr. Stephens' supervision.  (SOF at ¶ 80.)  Plaintiff worked in a shop where she was the only MPIC employee, and she never complained about the staffing of the shop.  (SOF at ¶ 37.)  Any complaints or any allegations regarding being "isolated" simply are without merit.

"The mere loss of some job responsibilities does not constitute an adverse employment action."  *Thompson v. City of Waco, Texas*, 764 F.3d 500, 504 (5th Cir. 2014).  Plaintiff's overall level of responsibility for the warehouse remained the same throughout her employment.  The fact that responsibilities changed does rise to the level of an adverse employment action.  *See, Finch v. City of San Antonio*, 2016 U.S. Dist. LEXIS 124427, at *29 (W.D. Tex. Sep. 13, 2016) (granting summary judgment when plaintiff's duties were slightly reduced); *Simmons-Myers v. Caesars Entm't Corp.*, 2012 WL 2885366, *1, *8 (N.D. Miss. July 13, 2012), *aff'd*, 515 F. App'x 269 (5th Cir. 2013) (holding no denial of promotion, salary or other benefit resulted from warning and thus was not an adverse employment action).  Moreover, Plaintiff cannot show she was treated less favorably than any employees outside her protected class.  Even if Plaintiff could establish a *prima facie* case, MPIC had legitimate, nondiscriminatory reasons for all of its actions, which Plaintiff cannot establish were pretext for race discrimination.  As a result, this claim must be dismissed.

### B.   Plaintiff's Constructive Discharge Allegations Does Not Come Close To Meeting The Required Threshold.

The Fifth Circuit considers a constructive discharge claim as an avenue for a plaintiff to prove an element of an adverse employment action where the employee resigns instead of being fired. *See Wells v. City of Alexandria*, No. 03-30750, 2004 WL 909735, at *1, *3 (5th Cir. Apr. 29, 2004).  Constructive discharge may be demonstrated by "offer[ing] evidence that the employer

20

made her working conditions so intolerable that a reasonable employee would feel compelled to resign." *Barrow v. New Orleans Steamship Assoc.*, 10 F.3d 292, 297 (5th Cir. 1994). To determine whether a reasonable person would feel compelled to resign, the Court looks for the following factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under another supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). The plaintiff must prove "a greater degree of harassment than that required by a hostile environment claim." *Id.* Plaintiff cannot solely rely on alleged discrimination to establish constructive discharge; there must be aggravating factors. *Ross v. Greenwood Utils.*, No. 2014 U.S. Dist. LEXIS 117189, *13 (N.D. Miss. Aug. 22, 2014).

Plaintiff voluntarily resigned her position after her request for a six hour shift was not met. (SOF at ¶ 58.) Plaintiff was willing to work from 8:00 a.m. until 2:15 p.m. (SOF at ¶ 51.) Plaintiff admits that if MPIC had transitioned her to part-time, she would have remained employed. (SOF at ¶ 59.) Such admissions do not indicate the workplace was permeated with badgering, harassment, or humiliation calculated to encourage her resignation or harassment greater than that for a hostile work environment claim. Plaintiff did not suffer a demotion, a reduction in compensation, any reduction in overall responsibilities, any reassignment, or harassment, or any offers for early retirement. The only reason Plaintiff did not remain employed is because she resigned after she was not granted a schedule from 8 – 2:15. Plaintiff's e-mail is telling, "What happened to the 8am to 2:15 pm, that you mentioned in the email? I'm ok with the change in pay and the status change. **Those are the only hours I can work otherwise I would have to resign.**"

(SOF at ¶ 51) (emphasis added.)  Plaintiff was willing to work, but only under her circumstances. The evidence plainly demonstrates she was not forced to resign.  Plaintiff cannot establish a *prima facie* case that she was constructively discharged.

The federal courts have routinely held that more egregious behavior than alleged by Plaintiff does not constitute constructive discharge.  For example, in *Haley v. Alliance Compressor LLC*, the employee claimed that her employer fabricated deficiencies in her performance, set an overly strict performance plan, threatened to fire her if she did not meet goals, micromanaged her, excluded her from department meetings, and ridiculed her in front of coworkers.  391 F.3d 650 (5th Cir. 2004). The employee also produced evidence "tending to show her superiors' intent to remove her from her job while she was on leave."  *Id.* at 652.  After holding the treatment did not constitute "badgering or harassment designed to encourage the employee's resignation that is required for constructive discharge," the Fifth Circuit held the plaintiff failed to create a jury question of constructive discharge.  *Id.* at 652-53.[9]

Here, Plaintiff has no evidence to demonstrate that any conduct toward her amounted to "badgering or harassment" encouraged to force her into resignation.  In fact, when Mr. Stephens stated to Plaintiff something to the effect of, "Please make sure that this shit is right.  I don't want anyone else to get fucking fired", Mr. Stephens was attempting to encourage Plaintiff to ensure Plaintiff would keep her job.  (SOF at ¶ 63-64.)  This was because numerous employees had been recently terminated by CEO Mr. Curtis, including Plaintiff's previous supervisor.  (SOF at ¶ 64.)

---

[9] *See also, Houston v. Miss. Dep't of Human Servs.*, 131 F. Supp. 3d 598, 605 (S.D. Miss. 2015).  In *Houston,* the plaintiff alleged she was improperly placed on a performance improvement plan as well as: (1) improperly reprimanded; (2) falsely accused of being a liar; (3) falsely accused of soliciting co-workers to donate their leave time; (4) constantly told she was "stupid" or had emotional and/or mental issues; (5) singled out by requiring her to sign in and out of work; (6) threatened with the loss of compressed days before higher management stepped in and reversed the decision; (7) singled out by requiring her to attend weekly meetings during which the plaintiff was verbally abused; (8) forced to prepare weekly memoranda summarizing the meetings; and (9) generally "bullied" in the workplace. *Id,* This Court held the plaintiff had not met her burden to demonstrate a constructive discharge claim. *Id.* at 609.

Mr. Stephens was not attempting to be hostile, aggressive, and certainly not discriminatory toward Plaintiff.  (SOF at ¶ 65.)  Plaintiff cannot establish a constructive discharge claim, and her "[s]ubjective, self-serving beliefs regarding discrimination, without more, is insufficient to withstand summary judgment."  *Peterson v. Next Prod., LLC*, 2017 U.S. Dist. LEXIS 133126, *4 (E.D. La. Aug. 21, 2017).

## II.   RACE HARASSMENT

To establish that she was subjected to a hostile work environment, Plaintiff must show: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action.  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).  When a plaintiff's supervisor is responsible, the plaintiff need not satisfy the fifth element, and the employer can be held vicariously liable for the supervisor's actions without a showing that the employer was personally negligent.  *See Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).  However, an employer may avoid vicarious liability in such a case if it can prove "(a) that [it] exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1988).  Again, Plaintiff separates her claim into alleged conduct prior to the alleged constructive discharge and conduct resulting in the alleged constructive discharge.

### A.   Plaintiff's Race Harassment Claim During Her Employment Fails.

23

Plaintiff complains about the vulgar language Mr. Stephens used with Plaintiff. (SOF at ¶ 62.) However, Plaintiff cannot establish any treatment, including the alleged language, was based on her race. Mr. Stephens admitted he used profanity in front of other employees, irrespective of race. (SOF at ¶ 75.) Accordingly, Plaintiff's hostile work environment claim fails for this reason alone. *See, Hairston v. Geren*, 2009 U.S. Dist. LEXIS 99497, *17 (S.D. Tex. Oct. 26, 2009). In *Hairston*, the Court held the plaintiff could not establish a hostile work environment because there was no indication that the profanity itself was race or gender specific or that there was any reference to plaintiff's race or gender. *Id.* at *16-17.

Similarly, in *Gibson v. Verizon Services Organization, Inc.*, the Fifth Circuit determined that the plaintiff did not present sufficient evidence that harassing behavior was based on sex or race. 498 F. App'x 391, 394 (5th Cir. 2012). The plaintiff alleged that her coworker left harassing comments on paper on her desk, refused to help her, lunged for a remote while she was watching television, had a history of bullying women, and acted erratically in response to a question. *Id.* at *393. The plaintiff also alleged that a separate coworker kicked her desk three times and a third coworker made a racial statement in reference to President Obama's election. *Id.* The Fifth Circuit stated that the racial comment in reference to President Obama was the only conduct that had a nexus to race or gender, and considering the totality of the circumstances, the comment was "not a sufficient basis to impute a similar, racial intent to [the coworker's] separate, unrelated actions and infer that all the conduct was based on race."

Plaintiff admits she never heard Mr. Stephens make a single remark regarding Plaintiff's race. (SOF at ¶ 88.) None of the comments or incidents alleged here invoked Plaintiff's race and, beyond conclusory allegations of mistreatment, Plaintiff provides no explanation of how the alleged harassment could be even implicitly tied to her race. Thus, the racial harassment

claim should be dismissed.  *See Ganheart v. Brown*, 2018 U.S. App. LEXIS 17938, *10 (5th Cir. June 29, 2018) (granting defendant's motion to dismiss when plaintiff provided no basis on which the court could conclude any harassment was based on race or gender.)

Moreover, Plaintiff cannot demonstrate the alleged conduct affected a term, condition, or privilege of her employment, or that MPIC knew or should have known of the purported conduct and failed to take prompt remedial action.  For conduct to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citing *Ramsey*, 286 F.3d at 268.)  In determining whether a hostile work environment exists, courts consider the "totality of the circumstances," including the conduct's frequency, its severity, whether it is physically threatening or humiliating or "a mere offensive utterance," and if it unreasonable interferes with the employee's work performance.  *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009)

Courts have generally concluded that vulgarity or profanity in the workplace, while unfortunate, is not sufficiently "severe or pervasive" to establish a *prima facie* case.  *Hairston*, 2009 U.S. Dist. LEXIS 99497, **18-19 (citing *Adams v. B&B Restaurants, Inc.*, 2008 U.S. Dist. LEXIS 68563, *4 (S.D. Tex. Sept. 4, 2008) ("Title VII is not a general civility code, and does not convert every workplace argument into a federal case, even when curses and insults are exchanged."); *see also, Williams v. City of Monroe*, 2015 U.S. Dist. LEXIS 10531, *24 (W.D. La. Jan. 29, 2015) ("there is no evidence that the comments made by two different supervisors created a hostile work environment. There is no evidence that [the supervisor's] profanity-laced order commanding [plaintiff] to get on his bus implicated race or that it affected a term,

condition, or privilege of his employment."); *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008) ("Profanity, while regrettable, is something of a fact of daily life.").

The Fifth Circuit Fifth Circuit has rejected hostile-work-environment claims with far more egregious acts of harassment. *See, e.g., Mosley v. Marion County*, 111 F. App'x 726, 728 (5th Cir. 2004) (holding three incidents involving racial slurs was insufficient to support hostile-work-environment claim); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 354 (5th Cir. 2001) (finding that plaintiffs failed to establish severe or pervasive harassment based on eight incidents of alleged racial harassment during a two-year period).  For all of these reasons, Plaintiff's harassment claim is entirely without merit and should be dismissed.

### B.   Plaintiff's Allegations Do Not Amount To Constructive Discharge.

Plaintiff attempts to bring a separate claim based on constructive discharge relating to racial harassment.  However, this is the same claim addressed by MPIC above, and for the reasons set forth in Section I.B., Plaintiff's constructive discharge claim relating to race harassment is entirely without merit and should be dismissed.

### III.   FAILURE TO ACCOMMODATE

To prevail on a failure-to-accommodate claim, a plaintiff must prove: (1) she is a "qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations."  *Feist v. Louisiana*, 730 F.3d 450, 453 (5th Cir. 2013).  "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform."  *Jenkins v. Cleco Power*, LLC, 487 F.3d 309, 315 (5th Cir. 2007).  "A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously."  *Id.* at 316.  "For an

employer to be liable under the ADA for failure to accommodate limitations caused by an employee's disability, the employee must request accommodation from the employer and participate in a "good faith interactive process" with the employer to arrive at a suitable accommodation. *Lockhart v. Sys. Made Simple*, 66 F. Supp. 3d 847, 855 (W.D. Tex. 2014) (citing *E.E.O.C. v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 624 (5th Cir.2009); *Tullos v. City of Nassau Bay,* 137 F. App'x 638, 646 (5th Cir. 2005); *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735-36 (5th Cir. 1999). An employer is not required to provide an employee's preferred accommodation; instead, an employer is only required to reasonably accommodate employee's known disability. *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996). Plaintiff cannot meet the criteria of a *prima facie* case because she was not a qualified individual with a disability, no alleged disability or its consequential limitations were known by MPIC, and MPIC never failed to make reasonable accommodations for any known limitations.

### A.    Plaintiff Was Not A Qualified Individual With A Disability.

#### 1.    Plaintiff's Impairment Is Not a Covered Disability under the ADA.

The threshold inquiry is whether or not a plaintiff has a disability within the meaning of the Americans with Disabilities Act ("ADA"). *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998). A disability is defined as (1) a physical or mental impairment that substantially limits one or more of the major activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12101(a)(1); 29 C.F.R. § 1630.2(g).

In order to prove the existence of a disability under the first prong of the disability definition, a plaintiff must offer evidence that an impairment "substantially limits the plaintiff's ability to

perform a major life activity as compared to most people in the general population."[10] 29 C.F.R. §

1630.2(j)(1)(ii); *Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011).   Major life activities include:

"caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, and working."  *Id.*

Courts apply several factors to determine whether an impairment results in a substantial

limitation. These factors include: "the nature and severity of the impairment; the duration or

expected duration of the impairment; and the permanent or long term impact or the expected

permanent or long term impact of, or resulting from, the impairment." *Armstrong v. Boehringer*

*Ingelheim Pharm., Inc.,* 2010 WL 2540751, *15 (N.D. Tex. June 21, 2010).   Merely having a

medical diagnosis is insufficient; rather, the ADA requires plaintiffs to offer evidence that "the

extent of the limitation caused by their impairment in terms of their own experience is substantial."

*Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).

Here, Plaintiff cannot establish that her anxiety or depression substantially limits her ability

to perform a major life activity as compared to most people in the general population; thus, her

disability claim must fail. 29 C.F.R. § 1630.2(j)(1)(ii).   For example, in *Aldrup v. Caldera*, 274

F.3d 282, 287 (5th Cir. 2001), the plaintiff alleged that he suffered from the disability of depression

caused by "the stress and anxiety of having to work with certain employees at the [Houston

Station]."   The Court held plaintiff could not demonstrate he was disabled because the evidence

"would merely tend to show that he was unable to perform any job at one specific location, and is

not evidence of Aldrup's general inability to perform a broad class of jobs."   *Id.*   Similarly, in

*Thibodeaux v. Dow Chem. Co.*, 2018 U.S. Dist. LEXIS 84126, *20 (M.D. La. May 17, 2018), the

---

[10] The Complaint states, "Plaintiff suffered a disability within the meaning of the ADA."  (Compl., ¶ 87.)  Nothing in the Complaint indicates she is proceeding down the "record of" or "regarded as" prongs of the disability definition. Accordingly, MPIC assumes Plaintiff is alleging she was discriminated against on the basis of an actual disability.

plaintiff alleged he suffered from the disability of Adjustment Disorder caused by "stress related events that [] occurred while interacting with others in his assigned unit at work."  The plaintiff had been "diagnosed with adjustment disorder with depressed mood and anxiety due to job-related stress."  *Id.*  The Middle District of Louisiana held that while the claims demonstrate the plaintiff was likely unable to perform any job in a specific unit, it was not evidence of the plaintiff's general inability to perform a broad class of jobs.  *Id.*

First, MPIC believed Plaintiff wanted a part-time position because of childcare needs. (SOF at ¶ 48.)  In Plaintiff's March 2, 2016 e-mail, Plaintiff plainly states "I can't provide adequate child care for my ten-year-old at this time with those hours."  (SOF at ¶ 47.)  Additionally, Plaintiff's reasons for requesting a 7:00-3:30 shift at the outset of her employment was also due to childcare demands.  (SOF at ¶ 23.)  For this reason alone, Plaintiff's failure to accommodate claim is wholly without merit.

However, even assuming the request was for a medical condition, Plaintiff cannot establish she is disabled because she did not suffer a medical condition substantially limiting one or more of the major activities.  Plaintiff alleges because of anxiety and depression, she was limited in her ability to work and spend time with her family.  (SOF at ¶ 90.)  Plaintiff testified that at work, she was unable to focus on her job functions.  (SOF at ¶ 92.)  However, this does not establish Plaintiff could not perform an entire class of jobs as required to establish she was substantially limited. Plaintiff also contends due to the severity of anxiety and depression, the only thing she wanted to do when she got home from work was lay down and cry.  This is not enough, and other than working at her specific position (which she was willing to do under a part-time arrangement), Plaintiff cannot point to a major life activity, in which she contends she was substantially limited

(*e.g.*, caring for herself, performing manual tasks, walking, seeing, hearing, speaking, breathing, or learning).  Accordingly, Plaintiff cannot satisfy this prong of her failure to accommodate claim.

### 2.    Plaintiff cannot show that she was qualified for the position.

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).  A plaintiff can establish that she is "qualified" by showing that "either (1) [she] could perform the essential functions of the job in spite of [her] disability," or "(2) that a reasonable accommodation of [her] disability would have enabled [her] to perform the essential functions of the job." *E.E.O.C. v. LHC Group, Inc.,* 773 F.3d 688, 697 (5th Cir. 2014) (quoting *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996)).  Importantly, "[p]roviding a 'reasonable accommodation' under the ADA does not require the employer to 'relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees or hire new employees to perform those duties.'" *Claiborne v. Recovery Sch. Dist.*, 690 F. App'x 249, 254 (5th Cir. 2017) (quoting *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998)).

The essential functions of Plaintiff's position required that she work an eight-hour shift. (SOF at ¶¶ 55-57.)  Plaintiff's predecessor, Donna Walker, had worked an eight hour shift.  (SOF at ¶ 78.)  Plaintiff had also worked an eight hour shift, until she requested the position be moved to a six hour shift.  (SOF at ¶¶ 23-24.)  MPIC's female shop at CMCF was scheduled to operate for eight hours, and it needed a supervisor responsible for the inmates during those hours.  (SOF at ¶¶ 55-57.)  Plaintiff cannot point to a single other MPIC employee who was permitted to work for less than eight hours.  Any attempts to point to other employees who had different hours is unavailing, as different hours were also offered to Plaintiff.

30

Plaintiff cannot claim she is incapable of working and then claim capacity to work for purposes of an ADA claim.  *See Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 480-81 (5th Cir. 2000) (holding that the plaintiff could not perform the essential functions of the job at the time of her termination because during her leave she was "medically unable to perform the duties of her job" and shortly after she was terminated her "physician stated that she could not work").  Plaintiff testified that shortly after her resignation, her therapist advised her she was unable to work.  (SOF at ¶ 90.)  Accordingly, Plaintiff cannot establish she was qualified for the position.

**B.  Plaintiff Cannot Show Any Disability Or Its Limitations Were Known By MPIC Or That MPIC Failed To Make Reasonable Accommodations For Such Known Limitations.**

Again, the undisputed facts show that neither Ms. Watson nor Mr. Stephens were aware that Plaintiff was requesting a part-time time position because of any medical condition.  (SOF at ¶ 99.)  The only reason Ms. Watson and Mr. Stephens understood Plaintiff was requesting part-time was because she had issues with childcare.  (SOF at ¶ 94.)  Therefore, Plaintiff cannot demonstrate her alleged disability and its limitations were known by MPIC.

Additionally, it was determined that Plaintiff's manager position was required to work the full hour shift, an essential function of her position.  (SOF at ¶¶ 54-58.)  Plaintiff's request would have mandated that MPIC hire another employee to perform the functions of the Warehouse Manager position in order for Plaintiff to reduce her hours to part-time.  This is not a "reasonable accommodation."  MPIC is simply not required to hire new employees for Plaintiff's abandoned essential functions of the Warehouse Manager role.  *See, Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 724 (5th Cir. 2011).  "[W]here an employer has no part-time positions, the employer need not create such a position to accommodate a disabled employee; nor must it displace a temporary worker to place a disabled worker."  *Wilkerson v. Boomerang Tube, LLC*, 2014 U.S.

Dist. LEXIS 146695, *19-20 (E.D. Tex. Oct. 15, 2014).  Moreover, an employer is not obligated

to implement an accommodation that would "result in other employees having to work harder or

longer." *Hammond v. Jacobs Field Servs.*, 499 F. App'x 377, 382 (5th Cir. 2012) (citing *Turco*,

101 F.3d at 1094); see *Kralik v. Durbin*, 130 F.3d 76, 79 (3d Cir. 1997); *Daugherty v. City of El

Paso*, 56 F.3d 695, 700 (5th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996). The ADA does not

mandate that an employer must promote a disabled employee as an accommodation, reassign the

employee to an occupied position, create a new position, eliminate essential functions of a job, or

assign existing employees or hire new employees to perform abandoned essential functions of a

position.  *See Toronka*, 411 F. App'x at 724; *Still v. Freeport-McMoran, Inc.*, 120 F.3d 50, 53 (5th

Cir. 1997); *Turco*, 101 F.3d at 1094; *see also* 29 C.F.R. pt. 1630, App. § 1630.2(o).

Additionally, Plaintiff cannot demonstrate that MPIC had any other available part-time

positions open for which Plaintiff was qualified at the time of her alleged request.  *Burch v. City

of Nacogdoches*, 174 F.3d 615, 622 (5th Cir. 1999) ("[T]he law requires [an employee] to prove

that he is qualified for [the vacant] position. Part of that proof must be more than the worker's

self-serving testimony that he could have performed light-duty jobs from a physical standpoint.")

## IV.    DISABILITY HARASSMENT

Similar to Plaintiff's race harassment claim, her disability harassment claim is entirely

without merit.  In order to establish a hostile work environment based on disability, Plaintiff

must show: (1) she belongs to a protected group; (2) she was subjected to unwelcome

harassment; (3) the harassment complained of was based on her disability or disabilities; (4) the

harassment complained of affected a term, condition, or privilege of employment; and (5) MPIC

knew or should have known of the harassment and failed to take prompt, remedial action.  *Hayes

v. Brink's Inc.*, No. 2017 U.S. Dist. LEXIS 206314, *12 (S.D. Miss. Dec. 15, 2017) (citing

*Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir. 2001); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998).)   To determine if the work environment is abusive, the Court should consider "the entirety of the evidence, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance." *Flowers*, 247 F.3d at 235.

First, for the reasons set forth above, Plaintiff cannot establish she is disabled for purposes of a disability harassment claim.   Additionally, similar to her race harassment claim, Plaintiff can offer no evidence of any harassment based on her disability and certainly cannot meet the standard required to establish harassment that was so severe or pervasive as to alter the conditions of her employment. *See,* Section II.A., *supra.*   Plaintiff testified that during one conversation, Stephens advised her, "I'm sorry that you're dealing with the anxiety.  I hope it gets better."  (SOF at ¶ 89.)  The only the only other comment Plaintiff ever heard regarding any medical condition is one from Ms. Crosby – who was not an MPIC employee at the time – pertaining to Plaintiff's anxiety.  (SOF at ¶ 93.)  Plaintiff's belief that she was treated to conduct amounting to harassment based on a purported disability is completely baseless.  Accordingly, MPIC is entitled to summary judgment on this claim.

**V.     SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM.**

A cause of action for tortious interference with a contract generally will lie against one who maliciously interferes with a valid and enforceable contract.  *Levens. v. Campbell*, 733 So.2d 753, 760 (Miss. 1999); *Collins v. Collins*, 625 So.2d 786, 790 (Miss. 1993).  There are four elements of a claim for intentional interference with a contract under Mississippi law:

(1)     The acts were intentional and willful;

(2)     The acts were calculated to cause damage to the plaintiffs in their lawful business;

(3)     The acts were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the defendant (which constitutes malice);

(4)     Actual damage and loss resulted.

*MBF Corp. v. Century Bus. Commc'ns, Inc., A Subsidiary of Century Tel. Enters., Inc.,* 663 So.2d 595, 598 (Miss. 1995) (citations omitted); *Collins v. Collins*, 625 So. 2d 786, 790 (Miss. 1993). *See also Nichols v. Tri-State Brick & Tile Co.*, 608 So.2d 324, 327 (Miss. 1992).  It must also be proven that the contract would have been performed but for the alleged interference.  *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, (¶ 8) (Miss. 1998).  *See Levins v. Campbell,* 733 So. 2d 753, (¶ 25) (Miss. 1999) (holding that at will contracts of employment are subject to tortious interference with contracts claims).

An individual occupying a position of trust on behalf of a company is privileged, within the scope of that responsibility and in the absence of bad faith, to interfere with his principal's contractual relationship with a third person. *Hammons v. Fleetwood Homes Of Mississippi, In*c., 907 So.2d 357, 361 (Miss. App. 2004) (citing *Shaw v. Burchfield,* 481 So.2d 247, 255 (Miss. 1985).) Thus, any actions taken against Plaintiff by Mr. Stephens were privileged because Mr. Stephens held a position of trust with MPIC and acted in accordance with his responsibilities.  Mr. Stephens never terminated or interfered with Plaintiff's employment, which is further evidenced by Mr. Stephens attempting to adjust her hours, but Plaintiff's subsequent resignation.    (SOF at ¶¶ 46-58.)  Plaintiff chose to resign her employment.  (SOF at ¶ 58.)  Plaintiff cannot demonstrate any of Mr. Stephens's acts were intentional or willful, were calculated to cause damage to Plaintiff, were done with the unlawful purpose of causing damage or loss, were without right or justifiable cause on his part (constituting malice), or that actual damage and loss resulted because of Mr. Stephens's actions.  Mr. Stephens was not even a decision maker with respect to the decision not

34

to offer Plaintiff a part-time position to meet her childcare needs.  (SOF at ¶ 52-55.)  For all of these reasons, Plaintiff's claim of tortious interference with a contract and/or business relationship cannot be established, and the Court should grant summary judgment with respect to this claim.

## CONCLUSION

There are no genuine issues of material fact in dispute as to any of Plaintiff's claims. Plaintiff cannot point to a single negative comment concerning her race or medical condition. Additionally, Plaintiff was not treated any differently than any other employee outside her protected class.  The conduct Plaintiff alleges does not amount to harassment, constructive discharge or tortious interference, and Plaintiff was not terminated by MPIC.   Plaintiff resigned due to childcare needs.  Plaintiff did not suffer from a medical condition that would constitute a disability for a failure to accommodate claim.  There is simply no evidence on which a jury could reasonably find for Plaintiff on any of her claims.  Summary judgment must, therefore, be granted with respect to all of Plaintiff's claims.

Respectfully submitted,

/s/Nicole B. Dunlap
Nicole B. Dunlap
**FORDHARRISON LLP**
Mississippi Bar No. 103049
101 E. Kennedy Boulevard
Suite 900
Tampa, FL  33602-5133
Phone: 813-261-7800
ndunlap@fordharrison.com

Russell W. Jackson
**FORDHARRISON LLP**
Tennessee Bar No. 27322*
1715 Aaron Brenner Drive, Suite 200
Memphis, TN  38120
Telephone: (901) 291-1500
Facsimile:   (901) 291-1501

rjackson@fordharrison.com

**ATTORNEYS FOR DEFENDANTS**

*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that on September 4, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF filing system, which will send a notice of electronic filing to:

        Michael R. Brown, Esq.
        The Michael R. Brown Law Offices, PLLC
        120 North Congress Street, Suite 710
        Jackson, Mississippi  39201
        Email:  mbrown@mikelawms.com

        /s/ Nicole B. Dunlap
        Attorney